IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| DR. JILL STEIN, ANITA RIOS, LOGAN MARTINEZ, DEBORAH MANERA SMITH and ROBERT HANNON,<br><br>   Plaintiffs,<br><br>   v.<br><br>FRANK LaROSE, in his official capacity as Secretary of State of Ohio,<br><br>   Defendant. | Civil No.: No. 24-cv-4042<br>Judge Michael Watson |

## PLAINTIFFS' REPLY TO DEFENDANT'S MEMORANADUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION[1]

A singular falsehood underpins everything Ohio Secretary of State Frank LaRose ("the Secretary") says in his Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 16) ("Sec. Resp."). According to the Secretary, Anita Rios "withdrew her candidacy and asked for a substitution." Sec. Resp. 1. That is demonstrably false, and the Secretary knows or should know it is false based on the uncontroverted testimony he elicited in sworn depositions taken on October 18, 2024. *See* Deposition of Anita Rios ("Dep. Rios"), Exhibit 1; Deposition of Philena Farley ("Dep. Farley"), Exhibit 2.

Philena Farley, the Ohio Green Party (OHGP) member who submitted the August 28, 2024 letter requesting Rios's withdrawal, advised the Secretary's staff when she submitted the letter that Rios had not signed it, and that Farley herself had instead affixed a digital copy of Rios's signature.

---

[1] Because the Court ordered simultaneous briefing of the *Pullman* issue, Plaintiffs here do not respond/reply to the Secretary's *Pullman* argument.

1

Dep. Farley, 41:5-41:19; 42:5-42:12; 45:14-45:22.  Farley prepared the letter herself with no help from Rios, the Stein campaign, or anyone else.  Dep. Farley, 45:14-45:22; 47:18-48:1; Dep. Rios, 26:21-28:9; 29:14-29:25; 31:10-31:17; 48:20-50:8.  Farley had never before acted as an agent of Rios or the Stein campaign, and she was not authorized to act as their agent when she filed the letter.  Dep. Rios, 30:1-30:6; Dep. Farley, 14:6-15:25; Rios Letter, Exhibit 3; Declaration of J. Call ("Call Decl.") ¶¶ 4-5, Exhibit 4.  Farley submitted the letter not because anyone authorized or directed her to do so, but because she found the situation "confusing" and was unsure what to do – *i.e.*, based on an innocent misunderstanding.  Dep. Farley, 43:20-45:4.

Rios likewise advised the Secretary in a sworn statement submitted on September 27, 2024 and again on October 2, 2024 that she did not authorize or even know about the letter Farley submitted before she submitted it.  *See* Exhibit 3, Rios Letter. Rios swore to this again at her deposition.  Rios Dep., 30:1-30:11; 31:10-31:17.  Rios's deposition testimony also comports with Farley's as to all other material facts.

The uncontroverted record evidence thus establishes that Rios did not know about, much less authorize, any request to withdraw her candidacy. She did not know about or authorize any request for her substitution.  The Secretary's assertion to the contrary is therefore simply stunning.  It is flatly contradicted by the uncontested evidence the Secretary himself propounded.

There is a simple explanation for the Secretary's reliance on a demonstrable falsehood: his refusal to count votes for a ballot-qualified candidate is indefensible.  Indeed, the Secretary does not attempt to defend it.  The Secretary instead mounts a generic defense of Ohio's withdrawal statute as applied to a candidate who has in fact withdrawn – which Plaintiffs do not challenge – but disregards his enforcement of that statute against a candidate who did not withdraw – which

2

Plaintiffs do challenge. But the Secretary falsely insists that Rios withdrew because his refusal to count votes for the ballot-qualified Stein-Rios ticket is plainly unconstitutional.

The Secretary makes much of Plaintiffs' purported delay in bringing this case when it is the Secretary's own delay – not to mention his unexpected misconstruction of Ohio law – that caused the present and ongoing violation of Plaintiffs' First and Fourteenth Amendment rights. The Secretary waited 22 days, until September 19th – the day before announcing that the general election was "officially underway" with absentee ballots already mailed[2] – to notify Plaintiffs of his decision not to count votes for the Stein-Rios ticket. Whether by neglect or by design, the Secretary's delay guaranteed that absentee ballots would be mailed, with notices that votes cast for Stein-Rios wouldn't be counted, before Plaintiffs could respond.

Now the Secretary relies on his own dilatory action to warn the Court of the supposed confusion and disruption that will result if the Court grants the modest relief Plaintiffs seek here – the counting of votes cast for the ballot-qualified Stein-Rios ticket. The Secretary's professed concern would be risible if it weren't at the expense of the untold thousands of Ohio voters he seeks to disenfranchise. If the Court grants Plaintiffs relief, the worst that can happen is that some Stein-Rios supporters will not vote for them under the mistaken impression that their votes would not count. By contrast, if the Court denies Plaintiffs relief, it is a certainty that thousands of Ohio voters will be disenfranchised.

Only the most compelling state interest could justify this most severe burden on the voting rights of Plaintiffs and countless more Ohio voters, but on this critical point the Secretary again comes up empty and resorts to evasion. Voters' rights are not burdened if they "cannot vote for a

---

[2] *See* Ohio Secretary of State Media Center, *Ohio's 2024 General Election Officially Underway as Military And Overseas Voting Begins*, September 20, 2024, available at https://www.ohiosos.gov/media-center/press-releases/2024/2024-09-20/ (accessed October 21, 2024).

3

candidate who did not make the ballot," the Secretary contends, Sec. Resp. 20, disregarding that Stein-Rios did make the ballot, they remain on the ballot, voters can cast their ballots for them, and the only issue in this case is whether the Secretary – the chief elections official charged with administering elections in a manner that guarantees the constitutional rights of all – will count those votes. The answer is clear: count the votes.

### I. This Court Has Jurisdiction Over Plaintiffs' First and Fourteenth Amendment Claims.

The Secretary's assertion that Plaintiffs fail to assert federal claims is so obviously wrong that it hardly requires citation to refute. Plaintiffs claim the Secretary's refusal to count their votes for the ballot-qualified Stein-Rios ticket violates their First Amendment rights and their Fourteenth Amendment right to equal protection. Plaintiffs have cited authorities recognizing their right to cast their votes, to have their votes counted and reported, and to have their votes treated on an equal basis with all other votes cast for ballot-qualified candidates. *See Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *Gray v. Sanders*, 372 U.S. 368, 380 (1963). These authorities also hold that a state's failure to count or report votes for ballot-qualified candidates violates these rights.

The Secretary conspicuously fails to address the basis for Plaintiffs' federal claims or the authorities on which they rely. Instead, the Secretary argues that because he violated Ohio law, Plaintiffs must be asserting state law claims, not federal claims. Sec. Resp. at 9. The Secretary is incorrect. Plaintiffs' Verified Complaint clearly states claims under the First and Fourteenth Amendments. Plaintiffs do not include claims under Ohio law.

Furthermore, the Supreme Court has long held that a state or local governmental official's violation of state laws may also violate the federal Constitution, and that such violations can be pursued – as Plaintiffs do here – under 42 U.S.C. § 1983. *See Monroe v. Pape*, 365 U.S. 167

4

(1961). Even official action that is unauthorized by or contradicts state law, like the Secretary's here, constitutes governmental action "under color of" law for purposes of section 1983 and the First and Fourteenth Amendments. *Id*.

This case is closely analogous to *North Carolina Green Party v. North Carolina State Board of Elections*, 619 F. Supp. 3d 547 (E.D.N.C. 2022), in which the state elections board refused to timely certify the North Carolina Green Party as a new political party, even though it had satisfied all the state's procedural requirements. The Green Party sued in federal court, claiming that the elections board's unauthorized delay caused them to miss the state's filing deadline in violation of the First and Fourteenth Amendments. The elections board argued that the complaint was wholly a state-law matter and not proper for federal court: "because plaintiffs base their claims on the Board's 'alleged failure to follow state law to certify the Green Party, plaintiffs ask the court to determine whether the Board violated state law." *Id*. at 558. The Court disagreed: "the question of whether the court should enjoin the candidate-filing deadline … as to the Green Party is not a state-law issue. Instead, it is a federal constitutional issue concerning whether applying the July 1 candidate-filing deadline in light of the timing of the Board's investigation and certification violates plaintiffs' rights under the First and Fourteenth Amendments." *Id*.

That the elections board had violated state law in refusing to timely act did not mean that the case was purely a state law case. Instead, the ultimate question was whether the board's unauthorized delay in combination with the state's deadline violated the First and Fourteenth Amendments. Similarly, the ultimate question here is whether the Secretary's belated order that votes not be counted for the Stein-Rios ticket violates the First and Fourteenth Amendments. To be sure, the Secretary's violation of Ohio's laws – he knew the purported withdrawal letter was not

5

genuine and did not comply with O.R.C. 3513.30(D)[3] – are relevant to that inquiry. But that does not transform Plaintiffs' claims into state law matters. It just means the Secretary violated state law in the course of violating Plaintiffs' First and Fourteenth Amendment rights. *See*, *e.g.*, *North Carolina Green Party*, 619 F. Supp. 3d at 558.

## II. Plaintiffs Did Not Unduly Delay in Seeking Relief From This Court.

The Secretary argues that Plaintiffs' "egregious delay" should not be rewarded by equitable relief. Sec. Resp. at 12.[4] Just the opposite is true. Any unnecessary delay in this case is solely attributable to the Secretary, who waited over three weeks following Farley's mistaken submission of the August 28, 2024 letter to announce on September 19, 2024 – the day before voting was set to commence – his decision not to count votes cast for the Stein-Rios ticket. If the Secretary deliberately intended to disenfranchise voters who support the Stein-Rios ticket he could not have acted more effectively. Indeed, that very same day the Secretary instructed local boards of elections not to count Stein-Rios votes and to begin notifying voters that such votes would not be counted – as the Secretary had already done with absentee voters.

Plaintiffs, by contrast, began their efforts to correct the Secretary's actions immediately upon learning of his decision. Call Decl. ¶ 6. The Secretary led Plaintiffs to believe that he would reverse that decision by having Hun Li call Rios and ask her for a letter confirming that she did

---

[3] The Secretary incorrectly claims that the Ohio Supreme Court's holding in *State ex rel. Renner v. Athens County Board of Elections*, 2024-Ohio-356 (Feb. 1, 2024), was merely a plurality opinion. *See* Sec. Resp. at 7 n.1. The *Renner* holding was a unanimous per curiam decision, with three Justices expressly joining the opinion, three Justices joining the judgment and one Justice not participating. Because the issue of whether the candidate had properly withdrawn was critical to disposition of the case, the three Justices who joined the judgment necessarily agreed that she had not properly withdrawn in ruling against her. A unanimous majority thus concluded that her filing a letter – which did not include a request that her name not be printed on the ballot -- was not sufficient to effect a withdrawal under Ohio law.
[4] *Kennedy v. Benson*, 2024 WL 4327046 (6th Cir. 2024), *en banc denied*, 2024 WL 4501252 (2024), did not simply invoke laches and unreasonable delay to deny Robert Kennedy Jr.'s requested relief, as the Secretary incorrectly asserts. The Court instead relied upon preclusion principles, since Kennedy had already lost in the Michigan Supreme Court.

not intend to withdraw. Rios Dep., 46:13-47:14. On October 1, 2024 the Secretary advised the Stein campaign that he would not reverse his decision – that he was giving legal effect to the August 28 letter despite his knowledge that it was not authorized by Rios. Less than a week later, on October 7, 2024, Plaintiffs notified the Ohio Attorney General's office that they would file this action imminently if a satisfactory resolution could not be reached. The Ohio Attorney General's Office responded that it would "reach out to the SOS" about a possible resolution. When none was forthcoming, Plaintiffs on October 9, 2024 filed this action.[5]

The Secretary's suggestion that Plaintiffs filed this action "at the eleventh hour" thus lacks merit. Sec. Resp. 11. They acted promptly upon notice that the Secretary would not count votes for the Stein-Rios ticket. It is the Secretary who inexplicably and unacceptably delayed providing that notice for more than three weeks, until the general election had commenced, and then further delayed by suggesting he would reverse his decision if Rios provided a sworn statement. Finally, the modest relief Plaintiffs request – that the Secretary count votes for the ballot-qualified Stein-Rios ticket – is not burdensome because it is what the Secretary is required under Ohio law to do. And it will not cause confusion because the candidates are already on Ohio's ballots. The Secretary's announcement that he will not count votes for the Stein-Rios ticket, when they have not withdrawn, is more confusing to voters – and vastly more harmful to voters' rights.

### III. Plaintiffs Are Likely to Succeed on the Merits.

The Secretary offers no defense against Plaintiffs' claims that his refusal to count votes for the ballot-qualified Stein-Rios ticket violates their First and Fourteenth Amendment rights.

---

[5] The Secretary points to an email his staff sent the Stein campaign on September 6, 2024, as if it provided notice of the Secretary's intent not to count votes for the Stein-Rios ticket. It did not. The email primarily responded to inquiries the Stein campaign made several weeks earlier, then added at the end that the Secretary had received a withdrawal letter. It did not explain who the letter was from, what it said, or what the Secretary intended to do. In the event, the Stein campaign did not receive that email due to a failure of the email-forwarding function of the email address to which it was sent. Call Decl. ¶¶ 8-11.

7

Instead, the Secretary insists, contrary to the uncontroverted record evidence, that Stein and Rios are not ballot-qualified because Rios withdrew. The Secretary thus offers a generic defense of Ohio's statutory scheme as applied to a candidate who withdrew, but does not and cannot defend his enforcement of that statutory scheme as applied here, against a candidate who did not withdraw. The Secretary therefore effectively concedes that his refusal to count votes for the Stein-Rios ticket is unconstitutional under the facts of this case.

### A. The Secretary's Refusal to Count Votes for Ballot-Qualified Candidates Who Did Not Withdraw Cannot Survive *Anderson-Burdick* Scrutiny.

The Secretary purports to defend Plaintiffs' claims by asserting first that Ohio's "candidate-withdrawal statutes are non-discriminatory," Sec. Resp. 17, and next that they are "reasonable and minimally burdensome." Sec. Resp. 18. From there, it is an easy leap to the Secretary's conclusion that the "State's interests in orderly election administration outweigh" the burdens imposed by the statutes. Sec. Resp. 22. But this argument is entirely non-responsive to Plaintiffs' claims. Plaintiffs do not assert that Ohio's candidate-withdrawal statute is unconstitutional as applied in the ordinary case, but rather that it is unconstitutional as enforced by the Secretary here, against candidates who did not withdraw.

According to the Secretary, his enforcement of the candidate-withdrawal statute is non-discriminatory because "Plaintiffs identify no other similarly situated candidacy—i.e., another candidacy wherein a candidate withdrew outside the time frame provided for in Ohio Rev. Code § 3513.30(E)—which the Secretary has treated any differently." Sec. Resp. 18. As the Secretary well knows, however, Rios did not withdraw her candidacy. She did not attempt to do so, and neither she nor anyone associated with the Stein campaign authorized Farley's mistaken attempt. The evidence on this point is uncontroverted: Farley testified to that effect; Rios testified to that effect; Call, the Stein campaign's manager attested to that effect; and Farley's written submission

8

corroborates this testimony. *See supra* pp. 1-2; Call Decl. ¶¶ 4-5; Yi Decl., Ex. A. By insisting that Rios did withdraw, and refusing on that basis to count votes for the ballot-qualified Stein-Rios ticket, therefore, the Secretary is treating them unequally.

The Secretary's assertion that the candidate-withdrawal statute is minimally burdensome suffers from the same defect. It does not comport with the record evidence. If the Candidate Plaintiffs "wanted to withdraw Rios and substitute a different candidate, they simply had to do so before the deadline," the Secretary blithely opines, "[a]nd if they still wanted votes for the Stein presidential ticket to be counted, they could have simply not filed the August 28 letter." Sec. Resp. 19. Again, however, as the Secretary well knows, Plaintiffs did not file that letter and did not attempt to withdraw Rios; the Secretary's own evidence establishes that they contemplated doing so but took no action. *See* Yi Decl., Ex. A; Rios Dep, 31:10-31:17; Farley Dep. 41:10-41:19. And they took no action because they knew, after confirming with the Secretary's office, that it was too late to do so. Call Decl. ¶ 12.

The Secretary is correct that the crux of Plaintiffs' claims is not "the candidate-withdrawal deadlines themselves," but rather the Secretary's enforcement of the candidate-withdrawal statute against them when Rios did not in fact withdraw. Sec. Resp. 20. The Secretary attempts to dismiss this claim as "a clever attempt to clothe a state-law claim in *Anderson-Burdick* clothing," Sec. Resp. 20, but as previously explained, it is well-settled that the Secretary's refusal to count votes for a ballot-qualified candidacy violates Plaintiffs' First and Fourteenth Amendment rights. *See Dunn*, 405 U.S. at 336; *Williams*, 393 U.S. at 30; *Gray*, 372 U.S. at 380. Because the Secretary cannot defend his unconstitutional action, however, he disregards these authorities just as he disregards the uncontested evidence that belies his position.

9

Next the Secretary insists that the Voter Plaintiffs' rights "are minimally burdened." Sec. Resp. 20; *but see*, *e.g.*, *Williams*, 393 U.S. at 31 ("[T]he right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot."). According to the Secretary, the Voter Plaintiffs' rights are not even moderately burdened just because they "cannot vote for a candidate who did not make the ballot." Sec. Resp. 20. Again, as the Secretary well knows, the Stein-Rios ticket did make the ballot – they are on the ballot – but the Secretary refuses to count votes for them because an unauthorized individual mistakenly submitted a letter of withdrawal. That distinguishes this case from *Burdick*, on which the Secretary relies, where the plaintiff asserted a right to cast and have the state count a protest vote for Donald Duck. *See Burdick*, 504 U.S. 428, 438 (1992). The burden here, unlike the burden on the plaintiff in *Burdick*, is not "limited" as the Secretary asserts, Sec. Resp. 20, but total. The Secretary's refusal to count votes the Voter Plaintiffs wish to cast for ballot-qualified candidates will result in their disenfranchisement.

Far from asserting that Ohio may not "impose[] any restraint on voter choice," as the Secretary incorrectly asserts, Sec. Br. at 21 (quoting *Burdick*, 504 U.S. 440 at n.10), Plaintiffs make the much more limited claim that the Constitution forbids the Secretary from refusing to count votes for ballot-qualified candidates. That claim is well-supported by Supreme Court precedent the Secretary fails to address. That claim is so well-supported, in fact, that the Secretary prefers to pretend that Plaintiffs assert a different claim altogether. As a result, the Secretary offers no defense for Plaintiffs' claim that his unfounded enforcement of a withdrawal statute against candidates who did not withdraw severely burdens their First and Fourteenth Amendment rights.

For the same reasons, the Secretary's recitation of state interests that justify Ohio's withdrawal statute in the ordinary case fail to justify the Secretary's enforcement of that statute

10

here, against ballot-qualified candidates who did not withdraw. Sec. Resp. 22-23. The Secretary does not assert any interest that justifies such arbitrary state action because none exists. Consequently, the Secretary's action in enforcing the withdrawal statute against the Stein-Rios ticket cannot withstand *Anderson-Burdick* scrutiny. It is unconstitutional and should be enjoined immediately.

### B. Plaintiffs Are Entitled to Relief Because the Secretary's Determination That Rios Withdrew Was Manifestly Unreasonable and Unreasonably Investigated.

The Secretary contends that his determination that Rios withdrew was "more than reasonable," Sec. Resp. 27, and that "Farley supplied evidence … indicating that she was instructed by the Stein campaign to deliver the letter withdrawing Rios…." Sec. Resp. 28 (citing Yi Decl., Ex. A). The Secretary is incorrect on both points. As an initial matter, the Secretary disregards the critical fact that Farley advised his staff that Rios did not sign the letter Farley delivered. Furthermore, the evidence Farley supplied nowhere indicates that she was instructed by anyone to deliver the letter – it only indicates that there was a discussion about whether to attempt to substitute Rios, and if so, how. *See* Yi Decl., Ex. A. In fact, Farley's evidence proves that she was <u>not</u> instructed to deliver the letter. The last entry on her timeline reads: "We were all very frustrated during the state committee call that we didn't have much to go on. But officially, we didn't have a solid plan of action for a letter. I just needed someone to say, 'just leave it as it is,' but no one did." *Id.* It is manifestly unreasonable for the Secretary to conclude, on the basis of this evidence, that a letter Rios did not sign is a valid instrument to effectuate her withdrawal.

The Secretary claims without support that *Waters v. Churchill's* reasoning does not apply outside the public sector employment context. Sec. Resp. at 15, 26. That is incorrect. Justice O'Connor's plurality opinion, states:

11

> it is important to ensure not only that the substantive First Amendment standards are sound, but also that they are applied through reliable procedures. This is why we have often held some procedures—a particular allocation of the burden of proof, a particular quantum of proof, a particular type of appellate review, and so on—to be constitutionally required in proceedings that may penalize protected speech. See *Freedman v. Maryland,* 380 U.S. 51, 58–60 (1965) (government must bear burden of proving that speech is unprotected); *Speiser v. Randall,* 357 U.S. 513, 526 (1958) (same); *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775–778 (1986) (libel plaintiff must bear burden of proving that speech is false); *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510 (1991) (actual malice must be proved by clear and convincing evidence); *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 503–511(1984) (appellate court must make independent judgment about presence of actual malice).

*Waters v. Churchill*, 531 U.S. 661, 669 (1994).

"These cases," Justice O'Connor explained, "establish a basic First Amendment principle: Government action based on protected speech may under some circumstances violate the First Amendment even if the government actor honestly believes the speech is unprotected." *Id.* Importantly, she related these First Amendment procedural protections directly to administrative interferences with speech, proving that the rationale of *Waters* is not inexorably moored to public sector employment as the Secretary claims. "Speech can be chilled and punished by administrative action as much as by judicial processes; in no case have we asserted or even implied the contrary." *Id.*

"In fact," Justice O'Connor continued:

> in *Speiser v. Randall* [which ruled that government has the burden of proving that speech is unprotected]*,* we struck down procedures, on the grounds that they were insufficiently protective of free speech, which involved both administrative and judicial components. *Speiser,* like this case, dealt with a government decision to deny a speaker certain benefits—in *Speiser* a tax exemption, in this case a government job—based on what the speaker said. Our holding there did not depend on the deprivation taking place "specifically through the judicial process," and we cannot see how the result could have been any different had the process been entirely administrative, with no judicial review.

Id. at 669-70. "[T]he First Amendment creates a strong presumption against punishing protected speech even inadvertently …." *Id.*

12

Plainly the procedural protections implicit in the First Amendment are not limited to public sector employment. *See* Eugene Volokh & Brett McDonald, *Freedom of Speech and Independent Judgment Review in Copyright Cases*, 107 Yale L.J. 2431, 2431 (1998) ("as the Court has time and again held, certain procedural safeguards must accompany even substantively valid speech restrictions"). As Justice O'Connor stated, for example, procedural protections also apply to denials of tax exemptions. If the First Amendment procedurally protects the administrative denial of tax exemptions, it most certainly protects the right to participate in the political process and vote – rights that "rank among our most precious freedoms." *Williams*, 393 U.S. at 30.

To be sure, Justice O'Connor's opinion did not establish a one-size-fits-all procedural standard for all First Amendment matters. "We have never set forth a general test to determine when a procedural safeguard is required by the First Amendment," she stated. *Waters*, 531 U.S. at 671. "We must therefore reconcile ourselves to answering the question on a case-by-case basis …." *Id.* Thus, "all we say today is that the propriety of a proposed procedure must turn on the particular context in which the question arises—on the cost of the procedure and the relative magnitude and constitutional significance of the risks it would decrease and increase." *Id.*; *see also* Volokh, *supra*, at 2433 ("'First Amendment due process' jurisprudence has been a pragmatic, largely seat-of-the-pants, judgment about the real world impact of various procedural devices").

Conducting this balancing, Justice O'Connor concluded that even though the government as an "employer indeed has far broader powers than does the government as sovereign," *Waters*, 531 U.S. at 671, and "[g]overnment employee speech must be treated differently with regard to procedural requirements as well," *id.* at 673, government must act reasonably and draw reasonable conclusions when it disciplines its employees based on speech. Therefore, she ruled that "courts [must] look to the facts as the employer *reasonably* found them to be. It may be unreasonable, for

13

example, for the employer to come to a conclusion based on no evidence at all. Likewise, it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is clearly available." *Id.* at 677 (emphasis original).

Justice Souter concurred to emphasize that Justice O'Connor's "reasonableness test … is clearly the one that lower courts should apply." *Id.* at 685 (Souter, J., concurring). "A majority of the Court [including Justice Scalia] agrees that employers whose conduct survives the plurality's reasonableness test cannot be held constitutionally liable (assuming the absence of pretext), and a majority (though a different one [including Justice Stevens]) is of the view that employers whose conduct fails the plurality's reasonableness test have violated the Free Speech Clause." *Id.* "Accordingly," he observed, "the plurality opinion may be taken to state the holding of the Court." Commentators agree. *See Leading Cases*, 108 Harv. L. Rev. 261, 281 (1994) ("in *Waters v. Churchill*, two different majorities of the Court agreed … that trial courts should accept the employer's determination of what was said only if the employer follows reasonable procedures.") (footnote omitted); Laurence Rosenthal, *Permissible Content Discrimination Under the First Amendment: The Strange Case of the Public Employee*, 25 Hast. Con. L. Q. 529, 539 (1998) ("public employers are constitutionally required to perform a reasonable investigation before taking action against an employee").

Given that government has more authority and employees less First Amendment protection in the public sector employment context, O'Connor's holding – which Justice Souter explained was effectively a majority opinion – established a baseline on which more important First Amendment interests can be judged. Voting is one of our "most precious" constitutional rights. *Williams*, 393 U.S. at 30. At bare minimum the decisions made by administrative elections officials must comply with the First Amendment protections established by this baseline. At bare

14

minimum, the court must "look to the facts as the employer *reasonably* found them to be." Coming to a conclusion based on virtually no evidence, as the Secretary did here, is constitutionally unreasonable under the First Amendment. The August 28, 2024 letter, after all, did not even comply with Ohio's requirements for withdrawal. *See Renner*. The Secretary thus had *no evidence* under Ohio law to support his conclusion that Rios had withdrawn.

Even assuming that the letter did comply with Ohio law, the Secretary had strong reason to believe that it was not valid or legitimate: he knew that Rios had not signed it. The Secretary possessed only "extremely weak evidence" while "strong evidence [was] clearly available." The Secretary's failure to seek that strong evidence until after he had rendered his September 19, 2024 decision was unreasonable under *Waters* and the First Amendment. The Secretary did not even reach out to Rios or to the Stein campaign about whether Rios's signature was genuine before deciding that he would not count votes for the Stein-Rios ticket. Call Decl. ¶¶ 6-7. They were not provided the basics of due process – notice and an opportunity to respond – which have been long incorporated into the First Amendment's procedural protections.

The Secretary cites to cases outside the Sixth Circuit for the proposition that *Waters* does not mean what it says. *See, e.g.. Avant v. Doke*, 104 F.3d 203 (10th Cir. 2024) (concluding the procedural rights established in *Waters* exist but are not clearly established so as to overcome qualified immunity). The Sixth Circuit, however, has ruled that "under the plurality opinion in *Waters v. Churchill,* the decisionmaker *must* take the care in investigating the employee's alleged statement 'that a reasonable manager would use before making an employment decision ….'" *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 186 (6th Cir. 2008) (emphasis added); *see also Dye v. Office of Racing Commission*, 702 F.3d 286, 300 (6th Cir. 2012) ("[i]n *Waters,* a plurality of the Supreme Court held the *Connick* test should be applied to what the government

15

reasonably thought"); *Chrvada v. Borden, Inc.*, 14 F. Supp.3d 1013, 1017-18 (S.D. Ohio 1998) (same). Regardless of what other Circuits say – and it is far from clear that they disagree with the Sixth Circuit – the Sixth Circuit follows *Waters* and holds that the First Amendment requires a reasonable investigation followed by a reasonable conclusion. The Secretary's action here fails that test.

### IV. The Equities Weigh Heavily in Favor of Counting Votes for Ballot-Qualified Candidates Who Already Appear on Ohio's Ballots.

The Secretary argues that the public interest is served by not counting votes for Stein. It is too late, he claims, and voting will be disrupted. The Court should not credit the Secretary's far-fetched speculation that voters will "lose confidence in elections and not vote in the future," or even more unlikely, "may try to vote again" if the Court grants relief. Sec. Resp. 12. Again, the limited relief Plaintiffs request is the choice between counting votes for ballot-qualified candidates or sanctioning the Secretary's refusal to do so. It is the difference between protecting voting rights and disenfranchising thousands of voters. Even if the harms the Secretary imagines were credible – and they are not – the guaranteed disenfranchisement of thousands of voters far outweighs them.

Furthermore, the Secretary is solely responsible for any "disruption" that may arise, because the Secretary waited more than three weeks, until voting started, to announce his decision not to count votes for the Stein-Rios ticket. He ran out the clock on Ohio voters by waiting to the last second and leaving his action a fait accompli.

Be that as it may, the Ohio Supreme Court has established that Ohio's policy and interests lie in correcting ballots and counting votes in order to get elections right – even after early voting has started. In *State ex rel. Scott v. Franklin County Board of Elections*, 10 N.E.3d 697 (Ohio 2014), it ordered that ballots be corrected to include a candidate who was wrongly excluded even though early voting had already begun. To forego relief because voting had begun "would be

16

illogical and would make it nearly impossible for some candidates who are denied ballot access to seek relief in court." *Id.* at 699. The Court therefore ordered the local elections board "to add Scott's name to the May 6, 2014 primary ballot with all possible speed." *Id.* That ballots had already been cast without his name was no reason for precluding this relief under Ohio law.

Here, of course, Plaintiffs do not seek to add names to ballots, reprint them or change them. They merely seek to have votes that are cast for the Stein-Rios ticket on the existing ballots be counted. Because the Secretary has taken it upon himself (in violation of Ohio law) to inform voters that their votes for the Stein-Rios ticket will not count, he must also be ordered to correct that misinformation. Far from disrupting voting, such a correction will aid democracy. Democracy dies when government officials are allowed to manipulate ballots and votes to their and their political party's advantages. That is exactly what the Secretary seeks to do. His hands are not clean and his wrongdoing should not be rewarded.

**Conclusion**

For the foregoing reasons, and those stated in Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, the Court should grant the Motion and order the Secretary to count votes case for the Stein-Rios ticket.

Dated: October 21, 2024                        Respectfully submitted,

/s/Mark R. Brown
Mark R. Brown (Bar No. 081941)*
Newton D. Baker/Baker &
Hostetler Professor of Law
Capital University**
303 E. Broad Street
Columbus, OH 43220
MBrown@law.capital.edu
Phone (614) 236-6590
Fax    (614) 236-6596

Oliver Hall
(*Pro Hac Vice Pending*)
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC 20009
202-248-9294
oliverhall@competitivedemocracy.org

*Counsel of Record
**For identification only

*Counsel to Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2024, the foregoing document was filed using the Court's CM/ECF system, which will effect service upon all counsel of record.

>　　　*/s/Mark R. Brown*
>　　　Mark. R. Brown
>　　　*Counsel to Plaintiffs*